CITY OF ESTELLINE, Appellant, v. CALEF, et al, Respondents.

(234 N. W. 597.)

. (File No. 7012. Opinion filed January 30, 1931.)

*Lloyd B. Peterson*, of Watertown, and *C. R. Jorgenson*, of Sisseton, for Appellant.

*Bielski & Elliott*, of Sioux Falls, for Respondents.

BROWN, J. From May, 1925, until May, 1927, defendant Calef was treasurer of the city of Estelline, and the other defendants were sureties on his bond for $10,000 as such treasurer. When his successor qualified and demanded of Calef an accounting for the moneys received by him as treasurer and payment of the balance in his hands, he failed to account for the sum of $13,260.78 otherwise than by surrendering to him a claim for that amount against the insolvent Estelline State Bank, in which he had the city funds on deposit to the amount at the time of its suspension on September 16, 1926. On June 1, 1925, and again on May 3, 1926, that bank was, by the governing body of the city, designated as depositary of the city funds, pursuant to Rev. Code 1919, § 6344, as amended by Laws 1919, c. 272, and Laws 1925, c. 236. During all the time he was city treasurer, Calef was also president of Estelline State Bank, and for about nineteen years before he became president he was cashier of that bank. Prior to April, 1925, there was another bank in Estelline called Bank of Estelline of which George Lee was cashier. About the middle of April, 1925, the two banks were consolidated by Estelline State Bank taking over the Bank of Estelline, at which time Calef became president and Lee cashier of Estelline State Bank. Calef continued as managing officer and in full charge of the business of Estelline State Bank after the consolidation. This action by the city against Calef and the sureties on his bond for the recovery of the amount lost by failure of the bank was tried to a jury, and at the close of all the evidence plaintiff moved for a directed verdict against Calef for the amount of the shortage with interest and against the sureties for the sum of of $10,000, the amount of the bond, on the ground that the undisputed evidence and admissions in the answer showed that Calef during the time he was treasurer was also president and managing officer of the bank where he deposited the funds belonging to the city, and that he at no time advised the city coun-

cil that the bank was in failing circumstances or insolvent, and that the bank was in fact insolvent at least from the 1st day of June, 1926, and that Calef took no steps to withdraw any of the funds of the city but continued to deposit city funds in the bank up until within a few days of its suspension. The motion was denied, and the case submitted to the jury, which found a verdict for defendants on all the issues, and from judgment on the verdict and an order denying a new trial plaintiff appeals.

The only question argued on the appeal is the insufficiency of the evidence to justify the verdict and the denial of plaintiff's motion for a directed verdict. It is contended by plaintiff that the undisputed evidence shows that the bank was insolvent for a long time prior to its suspension, which occurred on September 16, 1926, and that the funds of the city were systematically used by Calef to bolster up his failing bank.

Defendant argues that the bank voluntarily closed its doors and may have done so while perfectly solvent for the purpose of winding up its affairs as a solvent institution, and that in this situation insolvency cannot be presumed, as would doubtlessly be the case had the bank been closed by the state banking department. But while one of the directors testified that the bank was closed by action of the directors, there is no doubt at all that this action was impelled by knowledge of the insolvency of the bank, for the bank was taken in charge by the superintendent of banks on the same day that it closed, and, as is admitted by defendant Calef's answer, it was taken in charge by the superintendent for the purpose of liquidation. In his testimony Calef repeatedly called the closing of the bank its "suspension," "the time the bank suspended," "the time of its suspension," and "the date of the suspension of the bank." The word "suspension" as applied to the business of a bank conveys to the average person the meaning of insolvency and is defined in Webster's dictionary as signifying to "stop payment, or not to meet obligations or engagements." There can be no doubt that in the instant case the bank was closed because of its insolvency. Among the assets taken over from the bank of Estelline were seven notes aggregating $37,500 which were admitted to have been "fictitious," and which were known to be such by Calef from a time immediately after the consolidation. It seems that the Bank of Estelline had in some way acquired a tract of largely rough

untillable land in Dewey county, fit only for grazing, and instead of carrying this land on its books as "other real estate," it had procured these notes aggregating $37,500 which in Calef's testimony are called "fictitious" notes, and in any event were without any consideration and not expected ever to be collected. This paper was carried by Estelline State Bank from the time of the consolidation down to its suspension and regularly reported as assets to the banking department. Calef testified that the makers of these notes "were never expected to pay the notes because the bank owned the land, but the department knew that it was carried as notes and approved of it." No witness ventured to express any opinion as to the value of this land. Calef said he never saw it and knew nothing about its value. The examiner in charge, after the bank was taken over by the department, said he had seen the land, that buildings on it would be worth from one thousand to fifteen hundred dollars, that the country was sparsely settled where the land is, and that it was from two to ten miles from a railroad. From the time of the consolidation until the time of the trial of this action four years later, none of this land had been sold. From April 16, 1925, to the date of its suspension, the reserve of Estelline State Bank was continually below the statutory limit of 17½ per cent, and varied from 3½ to 10 per cent. From April, 1926, to the date of suspension in September of that year, the capital stock of the bank was gradually impaired by reason of expense exceeding surplus, undivided profits and income, so that on June 30, 1926, impairment was $2,666, on July 31, $3,385, and on August 31, $5,862. Among the items "cash due from banks," carried as assets for the last six months prior to its suspension, was the sum of $6,350.99 due from First National Bank of Brookings, which during all this time was closed and in the hands of a receiver. Among the assets of the bank not including any of the notes heretofore referred to as "fictitious" were notes aggregating about $89,000 as to which a number of business men in Estelline well acquainted with the makers testified they were worth not to exceed about $3,000. The only evidence in opposition to this was that of Calef himself, who testified to values aggregating about $28,000. Much of his testimony as to such values was quite vague, indicating that while the makers had no resources "the moral risk was good" and that he "consid-

ered the note good"; that "he had always considered the paper worth its face"; that "as we looked at it at the time we considered it good." Giving to all of such testimony the value of a positive declaration that the paper was worth its face, there still was left among the assets of the bank paper to the amount of approximately $60,000 that was worthless. Respondent claims that prior to the consolidation the Bank of Estelline had made several assessments on its stockholders and had charged out of its bills receivable $94,788.73, which the Estelline State Bank held as non-ledger assets, and says that since no proof was offered as to the value of those assets, they must be considered worth their face. But Calef testified, "We made effort all the time to collect on the paper during the time between the date of consolidation and the suspension of the bank," and it appears that nothing had been collected. It can hardly be presumed that paper which had been charged out because not permitted by law to be longer carried as assets of the bank, and as to which efforts to collect during a period of seventeen months had resulted in nothing, could be presumed to be worth its face. The presumption would rather be that such paper was worth nothing, or at least that so far as it could be considered on the solvency of the bank it could only be deemed worth what had been collected on it up to the time of the suspension. The total resources of the bank during the six months preceding its suspension varied from approximately $646,845 to $588,400. We deem it unnecessary to further analyze the character of the assets of the bank. It seems indisputable that during a period of six months prior to its closing from one-eighth to one-tenth part of its book assets were utterly worthless, and that during such period it was actually insolvent.

■ ■ Defendant Calef being in the active management of the bank at the time is charged with knowledge of its condition. Benton School District v. Woodward (S. D.) 231 N. W. 288. Furthermore, Calef testified that during the time he was treasurer of the city of Estelline he was also president of the bank, and up to the time of its suspension he had general supervision of the records of the bank, was familiar with what they disclosed, knew what its cash reserve was at all times, what bills payable it owed, the amount of its deposits, and what bills receivable it had; that he did at no time say anything to city council about the advisability

of keeping the city money in that bank and never made any effort to withdraw any of the city money from the bank. Under these circumstances, the argument that since the city council designated Estelline State Bank as the depositary of city funds, defendants should not be held liable cannot prevail. To a similar contention in Independent School District v. Flittie, 54 S. D. 526, 223 N. W. 728, 730, this court in an opinion by Campbell, J., said:

"If, as a matter of fact, he [the treasurer] does have thoroughly reliable information, by reason of being an active managing officer of the depository or otherwise, that the depository is unsound and in imminent danger of insolvency, it is absurd to say that it does not constitute a breach of official duty for him to keep his information to himself and continue to deposit the moneys intrusted to him as an officer in a depository that he knows is unsound."

Appellant contends that there is no proof that the superintendent of banks at any time called upon Estelline State Bank to make good its reserve, and therefore the impairment of the reserve cannot be considered as proof of negligence on his part in allowing the city funds to remain on deposit in the bank. But in Re Hoffman Estates, 225 N. W. 717, 718, we held that: "A guardian who allows the funds of his ward to remain on deposit in a bank for a period of nearly a month after knowledge of a substantial and continued impairment of the depositary's reserve is liable for the loss of the deposit through the subsequent insolvency and suspension of the bank." In the instant case defendant Calef had knowledge of a substantial and continued impairment of his bank's reserve for a period of at least fifteen months, during which period he not only allowed the trust fund in his hands to remain in the bank, but during the last six months prior to the suspension, when not only the reserve was impaired but the capital of the bank was undergoing steady impairment, he continued to make fresh deposits. From April, 1926, until the suspension of the bank, Calef deposited between $14,000 and $15,000 of the city's money in the bank. During this time he must have known that the bank was insolvent and rapidly approaching the day when it must suspend.

 Respondent says: "Appellant has no presumption of insolvency to aid it in this case, as the bank was not ordered by the banking department to close its doors. The closing was the vol-

untary act of the Board of Directors, and so far as the record shows might have been the winding up of the bank's affairs as a going and solvent institution. So the burden of proving the insolvency of the bank was on the appellant. * * * No proof was offered to show that the bank failed to meet the demands of its creditors in the ordinary course of business." We think respondent is mistaken in these contentions. If the bank did not fail to meet the demands of its creditors in the ordinary course of business, then it was the duty of respondent to have gone to the bank and got the money and paid it over to appellant. The fact that he did not do this was proof enough that the bank had failed to meet the demands of its creditors in the ordinary course of business. We think the burden of proof of insolvency was not upon appellant. If the bank was solvent, Calef had no right to ascquiesce in its being closed and placed in the hands of the superintendent of banks. By so doing he placed the funds of the city beyond his control and placed them in the control of the superintendent of banks. That he did this, or consented to its being done, if the bank was solvent, was a failure to discharge faithfully the duties of his office as city treasurer. In Lane Independent Consol. School Dist. v. Endahl, 224 N. W. 951, 956, we say that when a school district has shown that its treasurer received funds of the district and failed to pay or account for the same, it has established prima facie a right to recover against the treasurer and the sureties on his bond, and "to successfully defend against a liability so established, prima facie, the treasurer had but to show a regular designation of a depositary of the particular funds, by the school board, his deposit therein of the funds, and the loss of the same *through insolvency of the bank.*" (Italics ours.) In Board of Education v. Whisman, 229 N. W. 522, 531, we say: "When a prima facie case is stated against a custodian of county, municipal, township, or school money for failure to pay over and account for the same, such custodian establishes a complete prima facie defense when he pleads and proves, without more, that he deposited said funds in a bank in the state of South Dakota in his name as treasurer or custodian, that the *funds were lost by failure of the depositary,* and that he has made proper tender of whatever indicia of such deposit he had received from said bank or the liquidating agency thereof." (Italics ours.) It will be seen by

the italicized sentences that the burden of proof seems to be on the treasurer to establish the insolvency of the depositary before he is relieved from the necessity of procuring and paying over the actual money. And all our cases hold that having established such prima facie defense the treasurer is nevertheless liable if he has been guilty of negligence or bad faith in using the depositary designated by the governing body, or selected by himself, and that the burden of showing lack of good faith, diligence, and prudence on the part of the treasurer is upon the plaintiff. We think in this case the insolvency of the bank is undisputedly shown, and, further, that Calef knew of its precarious condition and that its suspension on account of insolvency was inevitable during all of the time in which he deposited the funds constituting the balance which was lost by the failure of the bank. Plaintiff's motion for a directed verdict should have been granted, and the judgment and order appealed from are reversed.

POLLEY, P. J., and BURCH, J., concur.

ROBERTS, J., not participating.

CAMPBELL, J., I concur in so much of the opinion as holds that the judgment and order appealed from should be reversed.